IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| LARRY W. JOHNSON, | ) |
| | ) |
| Movant, | ) |
| | ) |
| v. | ) CIVIL ACTION |
| | ) NO. 2:17 - cv - 00512 RAJ |
| RCO LEGAL, P.S., | ) |
| | ) |
| | ) NOTE ON MOTION |
| Respondent. | ) CALENDAR: April 21, 2017 |

## DECLARATION OF CHARLES J. COLE

STATE OF GEORGIA

COUNTY OF DEKALB

Personally appeared before the undersigned duly authorized to

administer oaths, CHARLES J. COLE, who, after being duly sworn, deposes

and states on oath as follows:

1

1.

I offer this Affidavit based on my own personal knowledge. I am competent to testify, and I am over 18 years of age. I offer this Affidavit in support of Larry W. Johnson's Application for Confirmation of an Arbitration Award.

2.

I am an attorney who is licensed in the State of Georgia. My Georgia Bar Number is 176704.

3.

I represented Mr. Johnson in the matter of Larry W. Johnson v. RCO Legal, P.S.; AAA Case No. 01-15-0005-4704 (the "Arbitration"). Mr. Johnson filed an arbitration demand on October 27, 2015 in which he alleged that his employer, RCO Legal, P.S. ("RCO"), breached his Employment Agreement. Specifically, Mr. Johnson alleged that RCO breached that agreement when it terminated him "for cause" on September 10, 2015.

2

4.

On February 21, 2017, the Arbitrator, James M. Paulson, granted Mr. Johnson's Motion for Summary Judgment, finding that RCO breached the agreement when it terminated him "for cause". That ruling is attached as Exhibit "A". In that ruling, the arbitrator retained jurisdiction pending the parties' agreement "on the calculation of a remedy". (Exhibit "A", p. 1)

5.

On or about February 24, 2017, I reached out to RCO's counsel in an effort to determine whether the parties might be able to reach such an agreement. I was not encouraged. On March 2, 2017, I filed Claimant's Motion for Attorneys' Fees, Costs, Prejudgment interest, and for Final Award. That motion is attached as Exhibit "B".

6.

In that motion, Mr. Johnson sought an award in the principal amount of $540,000.00 in unpaid compensation pursuant to his Employment Agreement, $171,000.00 in attorneys' fees, $21,465.59 in costs, and $94,980.82 in

3

prejudgment interest, calculated through February 28, 2017. Prejudgment interest continued to accrue at the rate of $177.53 per day.

7.

RCO filed a Motion for Reconsideration on March 6, 2017. Mr. Johnson responded. Mr. Johnson incurred an additional $6,425.00 in fees, and an additional $2,825.00 in expenses, from March 1-March 18, 2017. My supplemental affidavit in support of these fees and costs, which I submitted to the arbitrator, is attached as Exhibit "C".

8.

Mr. Johnson requested the arbitrator to award these amounts. Accordingly, Mr. Johnson requested an award of attorneys' fees in the amount of $177,425.00, and an award of costs in the amount of $24,290.59.

9.

On March 29, 2017, the arbitrator issued a final award "granting judgment in favor of the Claimant and allowing the Claimant's request for damages, attorneys' fees, costs and prejudgment interest in the amounts specified in Claimant's motion". The final award is attached as Exhibit "D".

4

10.

Mr. Johnson requested, and the arbitrator awarded, the following amounts:

a) Principal amount: $540,000.00

b) Prejudgment interest at 12% per annum from September 10, 2015-March 29, 2017, in the amount of $100,129.19, continuing to accrue at a rate of $177.53 per day.

c) Attorneys' fees: $177,425.00

d) Costs: $24,290.59.

11.

The Employment Agreement is attached as Exhibit "E". Section 14 of that agreement provides that "...Judgment upon the award rendered by the arbitrator may be rendered by any court having competent jurisdiction."

FURTHER AFFIANT SAITH NOT.

CHARLES J. COLE

Sworn to and subscribed before me
this 30th day of March, 2017.

Kw Bertschi

Notary Public

(Notarial Seal)



K W BERTSCHI
Notary Public, Georgia
Dekalb County
My Commission Expires
February 03, 2019

My commission expires on:

2/3/2019

## AMERICAN ARBITRATION ASSOCIATION

Proceedings before

James M. Paulson, Arbitrator

In the matter of:

**LARRY W. JOHNSON,**

**Claimant**

v.

AAA Case No. 01-15-0005-4704

**RCO LEGAL, P.S.,**

**Respondent**

## RULING ON RESPONDENT'S AND CLAIMANT'S MOTIONS FOR SUMMARY JUDGMENT

**Ruling:** Based on the Arbitrator's review of the parties' Briefs, exhibits and Declarations in support of their Motions for Summary Judgment, their Briefs in Opposition, exhibits and Declarations in Opposition to the Motions as well as Washington statutory and case law, for the reasons set forth below, Respondent's Motion for Summary Judgment is **DENIED** as to its claim that it had cause to terminate the Claimant's employment but **GRANTED** in opposition to the claim under RCW 49.52.050. Claimant's Motion for Summary Judgment is **GRANTED** as to his claim that his employment was terminated without cause thereby entitling him to severance pay and attorney's fees and costs as described in the Agreement but is **DENIED** as to his claim under RCW 49.52.050. The Arbitrator retains jurisdiction for a period of sixty (60) days in the event the parties cannot agree on the calculation of the remedy.



Exhibit A

## *Basis for Ruling*

### *Brief Description of the Nature of Claims and Denials*

By a Demand for Arbitration filed with the American Arbitration Association on October 27, 2015 Larry W. Johnson claimed that his former employer, RCO Legal, P.S., had violated his Employment Agreement ("Agreement") in that he was improperly terminated "for cause" on September 10, 2015, thereby depriving him of severance pay.

Mr. Johnson is an attorney who is licensed to and has practiced law in Georgia since 1990. RCO is a law firm with its main office in Bellevue, Washington. Both Mr. Johnson and RCO represented banks regarding mortgage default and foreclosure matters. Mr. Johnson's Employment Agreement with RCO was entered into when Mr. Johnson's Georgia law firm (Johnson & Friedman) and its staff joined RCO effective June 30, 2013. Mr. Johnson's job title with RCO was Vice President, Southwest. The intention of the merger was to expand RCO's coverage of states from the Northwest to the Southeast.

### *Applicable Provisions of the Agreement*

Section 7 of the Agreement provides that if Mr. Johnson is terminated without cause by RCO, he is entitled to 36 months of pay at his then current base monthly salary. His current base salary at the time of his termination was $15,000.00. This would total $540,000.00. Correspondingly, if Mr. Johnson is terminated for cause he is not entitled to such payment.

Section 7 goes on to define cause by specifying nine different occurrences which constitute cause. Among the cited occurrences is 7(f) stating "[e]mployee engages in any act of theft, dishonesty, fraud, gross negligence or willful misconduct in the performance of Employee's assigned duties. . .."

### *RCO's Reasons for Termination*

In its letter of termination to Mr. Johnson, RCO President and CEO Routh listed three examples of "acts and decisions" constituting cause as defined in Section 7(f): (1) Failure to pay RCO when invoiced for use of RCO employee for personal matters. (2) Urging RCO to hire Mr. Johnson's daughter without disclosing the familial relationship. (3) Permitting subordinates to work substantially less than their full work schedule at their full rate of pay without requiring them to take leave.

In his Claim, Mr. Johnson denies these allegations by stating, in part: (1) He was never invoiced for the use of RCO personnel. (2) He did not hide the fact that he suggested hiring his daughter and assumed that appropriate management officials knew who she was. Moreover, relatives of other managers did work for RCO. (3) Allowing an employee to work as alleged does not constitute conduct amounting to cause under his Employment Agreement. Mr. Johnson subsequently was permitted to amend his complaint against RCO to include a claim of failure to pay wages under RCW 49.52.050.

2

RCO denied that claim contending that it had no basis under Washington law because Mr. Johnson's asserted right to severance pay is contested.

### After Acquired Evidence Assertion

During the course of discovery, RCO amended it reasons in support of its position that it had cause to terminate Mr. Johnson by alleging that he had improperly used client money in escrow accounts to offset unpaid legal bills of his old law firm Johnson & Friedman without client notice or approval. A major defense of RCO in this matter has been its reliance on this "after-acquired" evidence; that is, that Mr. Johnson's alleged misconduct excuses any breach by RCO in potentially not having cause to terminate him for the reasons asserted in his September 15th termination letter. A part of this defense is that RCO asserts that if it had known of Mr. Johnson's offsetting practice it would have terminated him at the time. On the other hand, Mr. Johnson vigorously denies that any use he or his firm made of escrow funds to offset outstanding legal bills was improper and that the practice violated his employment agreement with RCO.

### **Brief Description of Summary Judgment Motions**

#### Respondent's Motion for Summary Judgment

During the course of discovery on April 17, 2016 the Respondent filed its motion for summary judgment. The primary focus of this motion was to argue that Mr. Johnson's actions in winding down the Johnson & Freedman law firm were dishonest and unethical. RCO further contends that these actions amounted to "dishonesty" in the performance of his "assigned duties" within the meaning of section 7(f) of the Agreement thereby providing cause for his termination. This argument assumes that Mr. Johnson was acting in his capacity as Vice President of RCO when he was taking actions to "wind down" the Johnson & Freedman law firm. Even though the Respondent did not know of the Claimant's alleged misconduct until after it terminated his employment, RCO relies on the after-acquired evidence rule to argue that even if it did not have cause to terminate Mr. Johnson for the reasons set forth in its September 15th termination letter, his misconduct in winding down his old law firm constituted a material breach of the Agreement thereby excusing RCO from further performance under the Agreement. Accordingly, the argument goes, whether RCO breached the Agreement by its September 15th termination of Mr. Johnson is irrelevant.

In addition to the foregoing argument, RCO maintains that the three examples/occurrences specified in the September 15th termination letter do constitute cause for Mr. Johnson's termination. The Respondent recites its version of the facts and argues that each incident constitutes dishonesty and therefore cause under Section 7(f).

#### Claimant's Motion for Summary Judgment

After the conclusion of discovery, on November 28, 2016 the Claimant filed his motion for summary judgment. He cites to a Washington Supreme Court decision holding that where an employer handbook contained a provision requiring "just cause" for an employer to terminate an employee, the

employer would have just cause if the reason is not arbitrary, is supported by substantial evidence and reasonably believed to be true.  Claimant then recites evidence purporting to show that: (1) RCO did not act in good faith and was arbitrary and capricious because the actual reason it discharged Mr. Johnson was "to save money".  (2) Each of the three alleged reasons in the termination letter were not supported by substantial evidence because, *inter alia,* RCO never invoiced Mr. Johnson for use of RCO for personal litigation matters, he was not dishonest in recommending his daughter for a temporary position and he did not hide the failure of a subordinate to work full time while collecting his full salary.

### ***Legal Requirements Regarding Summary Judgment***

#### *Summary Judgment - Civil Rule 56*

Relevant portions of Washington Civil Rule 56 provide:

> "(a) For Claimant.  A party seeking to recover upon a claim, * * * may after the expiration of the period within which the defendant is required after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for summary judgment in the party's favor upon all or any part thereof.

> "(b) For Defending Party.  A party against whom a claim, counterclaim, or cross claim is asserted or declaratory judgment is sought may move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

> \*                    \*                    \*

> "(c) Motion and Pleadings.  * * * The judgment sought shall be rendered forthwith if the pleadings, * * *, and admissions on file, together with affidavits, if any, show that there is *no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law*." (emphasis added).

#### *Requirements for Summary Judgment Under Washington State Case Law*

The Washington state case law[1] on rendering summary judgment provides:

> "A motion for summary judgment may be granted only if, 'reviewing all of the pleadings, affidavits, depositions, admissions and all reasonable inferences drawn therefrom in favor of the nonmoving party', the trial court finds, '(1) there is no genuine issue as to any material fact, (2) that *all reasonable persons could reach only one conclusion*, and (3)

---

[1] *Higgins v. Stafford*, 123 Wn. 2d 160, 168-169 (1994).

that the moving party is entitled to summary judgment as a matter of law.'(citations omitted).

"The burden of proof is on the moving party to establish these elements. (citation omitted). However, the nonmoving party 'may not rely on speculation, argumentative assertions that factual issues remain… .'" (citation omitted) (emphasis added).

### *Evidence with Respect the Motions for Summary Judgment*

In this proceeding the Respondent has argued that the Arbitrator should only consider "admissible evidence" under the Washington Rules of Evidence in deciding the pending motions for summary judgment and has filed a motion to that effect. A case is cited holding that a state court judge must only consider admissible evidence in deciding a motion for summary judgment.   The Arbitrator finds this case inapplicable as the ruling applied to a judge and not a matter in arbitration. While the parties' Agreement references applying Washington state law on substantive contract law, it specifically incorporates the American Arbitration Association Employment Rules and states that these rules are "[i]ncorporated by reference into this procedure, [and] include but are not limited to . . .the hearing of evidence before the arbitrator." AAA Rule 30 provides that the "arbitrator shall be the judge of the relevance and materiality of the evidence offered, and conformity to legal rules of evidence shall not be necessary." Here the specific reference of the parties to not following the rules of evidence in the discretion of the arbitrator overcomes the general reference to following Washington substantive law. The Arbitrator rules that a determination will be made on a case by case basis, as may be needed, on the weight to be given to evidence submitted by the parties regarding the motions for summary judgment that may be otherwise inadmissible in a court proceeding.

### ***Relevant Contract Provisions***

This matter not only involves factual disputes regarding the conduct of the parties, it involves significant questions as to what the language of the Agreement means. Indeed, determining the meaning of the contract language is dispositive of several of the motions before the Arbitrator.  The application of appropriate rules of contract interpretation are necessary to resolve these disputes.  A key directive of Washington contract law is to determine the intent of the parties as expressed by the words of their agreement.[2]  Here neither party has suggested that extrinsic evidence is needed to determine the meaning of the Agreement as applied to the material facts. Accordingly, determining the meaning of the Agreement will be kept to the language of that document.

It must also be kept in mind that the Agreement provides in Section 12 that "[i]n any action or proceeding to *construe or enforce the terms* of this Agreement, including any arbitration . . ., the laws of the State of Washington shall govern." (emphasis added).  Washington Pattern Jury Instructions[3] state,

---

[2] *Dice v. Montesano*, 131 Wn. App. 675, 683-684 (2006); *Mayer v. Pierce County Medical Bureau, Inc.,* 80 Wn. App. 416, 420 (1995).

[3] Wash. Pattern Jury Instr. Civ. WPI 301.05.

5

in part, that "[a] contract is to be interpreted to give effect to the intent of the parties at the time they entered the contract." The finder of fact must also "*take into consideration all the language used in the contract, giving the words their ordinary meaning . . .*." (Emphasis added).

### Section 7 Right to Terminate Employment

As referenced earlier, Section 7 of the Agreement gives RCO the right under appropriate circumstances to terminate the Claimant's employment for "cause". In this regard, it must also be kept in mind that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement;"[4] that is, in exercising its power to terminate the employee, the employer must be reasonable.[5]

Additionally, the Agreement does not merely use the word "cause" to determine when Mr. Johnson's employment may be terminated. As described earlier, the Agreement in Section 7 gives a very precise and lengthy explanation/definition of what constitutes cause. Indeed, the Agreement in Section 16 cautions that "[e]ach party has had the opportunity to consult with counsel of their choosing in the drafting and negotiation of this Agreement; therefore it shall be construed against neither." Accordingly, the intention of the parties was to have the very extensive and precise definition of cause applied to each claimed occurrence. The Arbitrator must assume that each word was carefully chosen and must interpret the language to give effect to those words.

Both parties cite to the Washington Supreme Court decision in *Baldwin v. Sisters of Providence in Washington, Inc.,* 112 Wn. 2d 127, 137-139 (1989) generally defining the phrase "just cause" in an employer drafted handbook to be used as a guide to applying the precisely defined and jointly negotiated concept of "cause" in this Agreement. The Arbitrator concludes that RCO's discretion is much more limited by the precise language agreed to by the parties[6] in

---

[4] RESTATEMENT (SECOND) OF CONTRACTS §205 (1981); *Barrett v. Weyerhaeuser Co. Severance Pay Plan,* 40 Wn. App. 630, 635 (1985). In a dispute over entitlement to severance pay under an employment agreement the *Barrett* court held: "[I]n every contract there is an implied covenant of good faith and fair dealing that obligates the parties to cooperate with one another so that each may obtain the full benefit of performance." *Supra.* As applied to this matter, the covenant of good faith and fair dealing required RCO to confront Mr. Johnson with the three examples set out in the termination letter and to give him a chance to respond *before* finally concluding that termination was warranted.

[5] "Essentially, the implied covenant of good faith and fair dealing serves as a springboard for a case-by-case determination of reasonableness. Thus, the covenant serves as a basis for the proposition that *managerial discretion must be exercised reasonably* * * *. Elkouri & Elkouri, *How Arbitration Works,* (7th Ed. BloombergBNA 2012), pp. 9-50-51. (citations omitted) (emphasis added).

[6] The definition of "cause" in the Agreement is similar to the definition of "just cause" as that term is used in collective bargaining agreements. The Labor and Employment Law section of the American Bar Association has created treatises on that topic. Koven & Smith, *Just Cause: The Seven Tests* (BNA 3rd Ed. 2006); Brand & Biren, *Discipline and Discharge in Arbitration*

6

the Agreement than the general definition of "just cause" in *Baldwin* as simply "a fair and honest cause or reason" "reasonable believed by the employer to be true." To do otherwise would be to violate the basic tenant of contract law in Washington state of following the intention of the parties through the words they placed in their agreement. The *Baldwin* definition of "just cause" was in existence at the time the parties (both of whom are lawyers) drafted the Agreement with the help of outside counsel. The parties could have elected to put the phrase "just cause" in the Agreement but did not.

### *Relevant Language Defining "Duties" and "Occurrences Constituting Cause"*

Keeping in mind the Washington contract law that all language used in a contract must be considered in interpreting the meaning of the Agreement as applied to a specific situation, the following sections of the Agreement are relevant to that task. Respondent has raised as a major aspect of its defense the assertion that *all* of Mr. Johnson's conduct for which he was terminated was in furtherance of his position as Vice President for RCO. Section 4 of the Agreement provides, in part:

"Employee shall be paid a base salary * * * for full time devotion to tasks assigned by Employer, * * *. Employee shall accept no other jobs * * * while employed by Employer; *provided; however, that Employee may continue to serve as a manager or director of * * * Johnson & Freedman, LLC * * * for the purpose of winding down the operations of, and dissolving, such companies.*"

In this regard the Respondent has asserted four general actions or decisions by Mr. Johnson as "occurrences" in this matter constituting "cause"—the three examples given in the termination letter and the conduct of Mr. Johnson in winding down his old law firm including, but not limited to, the use of client escrow funds to offset legal bills without client knowledge or approval and the failure to forward funds to RCO under the Work in Process agreement. Language in the Agreement applying to each of these situations is analyzed below.

### *Section 7(f)*

In Mr. Johnson's termination letter of September 15th, 2015, as well as his conduct in winding down his old law firm, RCO focused on the language in Section 7(f) as the specific portion of the Agreement for its basis in determining that there was cause to terminate his employment. This section describes an occurrence amounting to cause if Mr. Johnson "engages in any act of theft, dishonesty, fraud, gross negligence or willful misconduct in the performance of [his] *assigned duties* . . .." (emphasis added). Specifically, RCO asserts that Mr. Johnson was dishonest as described in the three examples of his "acts and decisions" recited in his termination letter.

A determinative issue in this matter is whether the examples of alleged dishonest

---

(BNA 2nd Ed. 2008).

conduct were part of Mr. Johnson's "assigned" duties. Section 2 of the Agreement first requires Mr. Johnson as Vice President to "perform those services and activities *which are generally consistent with duties vested by Employer is such position.*" Section 2 *goes on to provide* that Mr. Johnson "shall also *perform such other duties as may be assigned to [him] from time to time.* . .." Accordingly, the Agreement distinguishes between "vested" and "assigned" duties. Mr. Johnson's duties as Vice President were "vested" as that word is used in the Agreement rather than "assigned" tasks. The word "assigned" normally assumes action by a superior requiring Mr. Johnson to perform a specific task. There is no evidence that President Routh or anyone designated by him, pursuant to Section 3 of the Agreement, *assigned* Mr. Johnson any of duties/tasks referenced in the alleged examples. Mr. Johnson's "vested" duties as Vice President came from his agreement with RCO as a legal entity and not President Routh personally.

A substantial concern also exists as to whether the three alleged examples of misconduct in the termination letter more accurately fall under some other of the nine provisions of Section 7. While RCO has contended that all of Mr. Johnson's duties as a Vice President of RCO were "assigned", Section 7(e) more precisely covers a problem with Mr. Johnson's performance as Vice President by providing that cause may exist if Mr. Johnson "fails or refuses faithfully and diligently to perform *the usual and customary duties* of his employment". (emphasis added). It appears to the Arbitrator that acting properly as to the three examples cited in the termination letter most properly come under his "usual and customary duties" as a Vice President for RCO. However, Section 7(e) also has the proviso that "such failure or refusal [must continue] for thirty (30) days after written notice thereof has been given to Employee by Employer's President and/or the Director of Human Resources" in order for such an occurrence to amount to cause. No thirty (30) day notice was given to Mr. Johnson as to any of the three examples. By claiming that Section 7(f) applies to the alleged misconduct, RCO improperly avoids the 30 day notice requirement of Section 7(e). The purpose of the thirty (30) notice was to give Mr. Johnson fair warning to correct his behavior or else he would be terminated. Indeed, by contorting Mr. Johnson's alleged misconduct to be covered under Section 7(f), RCO has failed to establish cause for his termination in those situations.

### Section 7(c)

RCO contends in this matter that, *inter alia*, Mr. Johnson violated the Work in Process Agreement with Johnson & Friedman by not remitting all funds to RCO thereby further violating Section 7(c) of his Employment Agreement with RCO.[7] Specifically, RCO references the language in Section 7(c) which defines "cause" as Mr. Johnson's "material breach of any term of this Agreement or *any other agreement with*" RCO. (emphasis added). A fatal problem with RCO's contention is that the WIP agreement was not with Mr. Johnson personally but rather with his old firm Johnson & Friedman.[8] In this instance the Washington rule of contract interpretation requires that the language as agreed to and chosen by the parties be applied as written. There is no question that Mr. Johnson and his old firm are separate legal entities.

---

[7] Respondent's Motion for Summary Judgment, pp. 1-3.

[8] J. Carter's Declaration, Exhibit 2.

Accordingly, RCO has not established cause to terminate Mr. Johnson for the stated reason.

*Sections 4, 7(g), 7(h) & (i)*

Section 4 of the Agreement provides, in part: "Employee shall be paid a base salary * * * for full time devotion to tasks assigned by Employer * * *. Employee shall accept no other jobs, contracts, or other offers of work * * * while employed by Employer; *provided, however, that Employee **may continue to serve as a manager** or director of * * * Johnson & Freedman, LLC * * * for the purpose of winding down the operations of and dissolving such companies.*" (emphasis added). Significantly, the Agreement does not "assign" Mr. Johnson to wind down the operations of his old firm. He "may continue to serve as manager" in order to wind down the firm. Clearly, in his capacity as manager, he is representing Johnson & Freedman and not RCO in winding down the firm. That he is at the same time working for and being paid by RCO to be a Vice President does not change this situation. If the parties intended to "assign" Mr. Johnson the task of winding down his old firm in his capacity as RCO Vice President they would have used that word. Accordingly, Section 7(f) may not be used to terminate Mr. Johnson for his conduct/misconduct in winding down his old firm.

Other paragraphs of Section 7 would potentially apply to Mr. Johnson's alleged misconduct in winding down the firm and would constitute cause for termination. Section 7(g) states that cause exists if he is "suspended or disbarred from the practice of law in any jurisdiction." Section 7(h) states that cause exists if he is convicted of any "crime involving theft, dishonesty, fraud or moral turpitude or which materially impacts [his] ability to provide services to [RCO]." Finally, Section 7(i) indicates that cause exists if Mr. Johnson "or any law firm at which he is or *has been engaged* as a lawyer * * * while he is or *was* so engaged, engages in actions or activities which result in a material adverse impact on Employer's or its Affiliates' reputation such that its or their clients or customers threaten to terminate their relationship with [RCO] or its Affiliates because of [RCO's] continued employment of [him]". (emphasis added). The above referenced provisions of Section 7 appear to cover or potentially cover the allegations against Mr. Johnson as to his conduct in winding down Johnson & Freedman.[9] Obviously, when Mr. Johnson was employed by RCO and to date he has not been suspended or disbarred from the practice of law, convicted of a crime or cost RCO a client or customer by his continued employment.

Based on the foregoing analysis of the language of the Agreement, RCO does not have cause under any provision of Section 7 to terminate Mr. Johnson's employment for cause.

## *Claim Under RCW 49.52.050*

---

[9] The Arbitrator renders no opinion as to whether Mr. Johnson engaged in serious unethical behavior in this regard. The Georgia and Tennessee bar associations will decide that matter in responding to RCO's complaints against him.

Mr. Johnson's claim under RCW 49.52.050 asserts that RCO withheld his severance pay while knowing that it was owed to him. In response, RCO points out that Washington case law[10] holds that there can be no claim under the statute where a bona fide dispute exists as to whether the wages must be paid. Here both parties have raised a vigorous dispute as to whether Mr. Johnson is entitled to severance. Substantial and extensive arguments have been raised by both parties. Notwithstanding the Arbitrator's granting the Claimant's motion for summary judgment on his contract claim, the evidence shows that RCO consistently disputed that it owed Mr. Johnson severance pay.

James M. Paulson, Arbitrator

February 21, 2017

---

[10] *Snoqualmie Police Ass'n v. City of Snoqualmie*, 165 Wn. App. 895, 908 (2012). "'Willful withholding' is 'the result of knowing and intentional action and not the result of a bona fide dispute as to the obligation of payment." "A 'bona fide' dispute is one that is fairly debatable whether all or a portion of the wages must be paid."

10

James Paulson, Arbitrator

## IN ARBITRATION

| | |
|---|---|
| LARRY W. JOHNSON, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | ) |
| | ) NO. 01-15-0005-4704 |
| RCO LEGAL, P.S. | ) |
| | ) |
| Respondent. | ) |
| | ) |

## CLAIMANT'S MOTION FOR ATTORNEYS' FEES, COSTS, PREJUDGMENT INTEREST, AND FOR FINAL AWARD

Claimant Larry W. Johnson ("Johnson") filed this action alleging that

Respondent RCO Legal, P.S. ("RCO") breached his Employment Agreement

when it terminated him for cause, effective September 10, 2015, and when it

failed to pay his $540,000.00 severance payment.

On February 21, 2017, the Arbitrator granted summary judgment in

favor of Johnson on that claim. Specifically, the Arbitrator held that

Johnson's "…employment was terminated without cause thereby entitling

Exhibit B

him to severance pay and attorneys' fees and costs as described in the Agreement..."

The Arbitrator further held that "The Arbitrator retains jurisdiction for a period of sixty (60) days in the event the parties cannot agree on the calculation of the remedy."

Johnson tried unsuccessfully to settle his claim against RCO before he filed this action. (L. Johnson Aff., ¶ 4) Johnson tried unsuccessfully to settle his claim after he filed this action. (L. Johnson Aff., ¶ 13; C. Cole Aff., ¶ 13) Specifically, on February 4, 2016, approximately one month before RCO's general counsel and its counsel in this action both traveled to Atlanta to take the first five depositions in the litigation, Johnson offered to settle his claim for $315,000.00. (L. Johnson Aff., ¶ 13; C. Cole Aff., ¶ 13) A copy of the letter conveying Johnson's offer is attached to the Affidavits as Exhibit A. RCO never responded to Johnson's offer. (L. Johnson Aff., ¶ 13; C. Cole Aff., ¶ 13)

In light of RCO's refusal to negotiate, Johnson chose to litigate the dispute.

Now, Johnson seeks to recover his attorneys' fees and costs, pursuant to the terms of the Employment Agreement. Specifically, Section 13 of the agreement provides as follows:

13. **Attorneys' Fees and Costs**: In any action or proceeding, including any arbitration proceeding, to construe or enforce the terms of this Agreement, the prevailing party shall be entitled to recover its fees and costs, including reasonable attorneys' fees and costs in arbitration, on appeal and in any bankruptcy proceeding, and the non-prevailing party shall be required to pay the fees and costs of the arbitration proceeding.

The Arbitrator determined in the February 21, 2017 Ruling that Johnson is entitled to attorneys' fees and costs.

### A. Johnson's Attorneys' Fees and Costs

Johnson has incurred $171,000.00 in attorneys' fees, through and including February 28, 2017. (C. Cole Aff., ¶ 11) These fees are reasonable, both in terms of the hourly rate charge, and in terms of the efficiency with which the work was done. (C. Cole Aff., ¶ 12; L. Johnson Aff., ¶ 12) The litigation was hard-fought, and extensive discovery was conducted by both sides. After RCO chose not to respond to Johnson's February 4, 2016 settlement offer, Mr. Griffin and Mr. Galbraith traveled to Atlanta to take the depositions of five witnesses in Atlanta during the week of February 29, 2016. (C. Cole Aff., Ex. 5-6) In June 2016, Johnson's counsel and Mr. Johnson traveled to Seattle to take the depositions of four RCO witnesses. (C. Cole

Aff., Ex. 11) As RCO principal Stephen Routh was not available during that week, Johnson's counsel traveled to Seattle again in November 2016 to take Routh's deposition. (C. Cole Aff., Ex. 14) In addition, RCO took the deposition of Johnson's daughter, Kelly O'Donnell, and Johnson took the deposition of RCO employee Lori McGowan. (C. Cole Aff., Ex. 12-13)

The Arbitrator read the briefs filed in connection with the competing motions for summary judgment. Johnson's briefs and related pleadings in support of his motion, and in response to RCO's motion, were factually intensive, and much effort went into them.

Johnson requests that the Arbitrator award attorneys' fees in the amount of $171,000.00, and costs in the amount of $21,465.59, through February 28, 2017.

## B. **Prejudgment Interest**

Prejudgment interest is governed by RCW 19.52.010, which provides that "Every loan or forbearance of money, goods, or thing in action shall bear interest at the rate of twelve percent per annum where no different rate is agreed to in writing between the parties..."

When a party breaches an obligation to pay a liquidated debt, a forbearance is created. The creation of the forbearance triggers the

application of the prejudgment interest statute. TJ Landco, LLC v. Harley C. Douglass, Inc., et al., 186 Wash. App. 249 (2015) Interest is available from the moment of breach. State of Washington Department of Corrections v. Fluor Daniel, Inc., et al., 160 Wn.2d 786 (2007)

A claim for unpaid employment compensation is a liquidated claim upon which prejudgment interest accrues. City of Moses Lake v. International Association of Firefighters, Local 2052, 68 Wn. App. 742 (1993)

RCO breached the Employment Agreement when it wrongfully terminated Mr. Johnson for cause on September 10, 2015. Calculated at 12 percent per annum, prejudgment interest amounts to $94,980.82 through and including February 28, 2017. It continues to accrue at the rate of $177.53 per day.

WHEREFORE, Johnson seeks an award of $540,000.00 in unpaid compensation owed pursuant to his Employment Agreement, $171,000.00 in attorneys' fees, $21,465.59 in costs, and $94,980.82 in prejudgment interest, through February 28, 2017. The total as of February 28, 2017 amounts to $827,446.41.

This 2nd day of March, 2017.

**MCRAE BERTSCHI & COLE LLC**
Suite 200, 1350 Center Drive
Dunwoody, Georgia 30338

/s Charles J. Cole
Charles J. Cole
Georgia Bar No. 176704
cjc@mcraebertschi.com
678.999.1105

*Counsel for Claimant*

James M. Paulson, Arbitrator

## IN ARBITRATION

| | |
|---|---|
| LARRY W. JOHNSON, | ) |
| | ) |
| Claimant, | ) |
| | ) CASE NO. 01-15-0005-4704 |
| vs. | ) |
| | ) |
| RCO LEGAL, P.S., | ) |
| | ) |
| Respondent. | ) |

## **SUPPLEMENTAL AFFIDAVIT OF CHARLES J. COLE**

STATE OF GEORGIA

COUNTY OF DEKALB

Personally appeared before the undersigned duly authorized to administer oaths, CHARLES J. COLE, who, after being duly sworn, deposes and states on oath as follows:

Exhibit C

1.

I offer this Affidavit based on my own personal knowledge. I am competent to testify, and I am over 18 years of age. I offer this supplemental Affidavit in support of Larry W. Johnson's Motion for Attorneys' Fees, Costs, and Prejudgment Interest, and for Final Award.

2.

Mr. Johnson has paid all expenses in connection with this matter. These expenses totaled $21,465.59, through February 28, 2017.

3.

Mr. Johnson's legal fees amounted to $171,000.00, through February 28, 2017. The bills reflecting these expenses and fees are attached to the Affidavit that I filed on March 1, 2017.

4.

RCO filed a motion for reconsideration on March 6, 2017. In March, Mr. Johnson has incurred an additional $2,825.00 in expenses from AAA. He has also incurred an additional $6,425.00 in fees. My firm has spent 25.7 hours in March, through March 18, on this matter, which will be billed at a rate of

$250.00 per hour. Most of this work was done in connection with responding

to RCO's motion for reconsideration. The work that we did was reasonable

and necessary to obtain a successful outcome in this proceeding.

5.

Accordingly, through March 18, 2017, Mr. Johnson's expenses amount

to $24,290.59, and his fees amount to $177,425.00. Prejudgment interest

continues to accrue at the rate set forth in the motion for final award,

attorneys' fees, costs, and prejudgment interest.

FURTHER AFFIANT SAITH NOT.

CHARLES J. COLE

Sworn to and subscribed before me
this ⎽20⎽ day of ⎽MARCH⎽, 2017.

Notary Public

(Notarial Seal)

My commission expires on:
⎽OCT  7  2017⎽

## CERTIFICATE OF SERVICE

The undersigned declares that a true and accurate copy of the

document to which this declaration is attached was e-mailed on this day to:

Michael A. Griffin
520 Pike Street, Suite 2300
Seattle, Washington 98101
Michael.Griffin@jacksonlewis.com

This 20th day of March, 2017.

/s Charles J. Cole
Charles J. Cole

## AMERICAN ARBITRATION ASSOCIATION

Proceedings before

James M. Paulson, Arbitrator

In the matter of:

**LARRY W. JOHNSON,**

**Claimant**

v.

AAA Case No. 01-15-0005-4704

**RCO LEGAL, P.S.,**

**Respondent**

## AWARD

Based on the Arbitrator's Rulings on the Claimant's Motion for Summary Judgment and the Claimant's Motion for Attorneys' Fees, Costs and Prejudgment Interest the Arbitrator issues this Award granting judgment in favor of the Claimant and allowing the Claimant's request for damages, attorneys' fees, costs and prejudgment interest in the amounts specified in Claimant's motion. The request of the Respondent to escrow the amounts awarded should be directed to a court of competent jurisdiction in the event this Award is appealed.

James M. Paulson, Arbitrator

March 29, 2017





RCO LEGAL, P.S.

**Employment Agreement**

June 30, 2013

| | |
|---|---|
| Position: | Vice President, Southeast Region |
| Employee: | Larry W. Johnson |
| Effective Date: | June 30, 2013 |

1. RCO Legal, P.S. ("**Employer**") wishes to hire Larry W. Johnson ("**Employee**") and Employee wishes to be hired by Employer, subject to the terms, conditions and mutual covenants and promises set forth in this Employment Agreement (this "**Agreement**"). Employee acknowledges and agrees that Employer's offer of regular employment constitutes sufficient, adequate and valuable consideration in support of Employee's covenants set forth herein, and that the terms and conditions of this Agreement represent a benefit to Employee. Employee acknowledges and understands that Employer is affiliated with other companies (presently including RCO Legal – Alaska, Inc., Realty in Motion, LLC ("RIM"), Northwest Trustee Services, LLC, Northwest Trustee Services, Inc. (WA), Northwest Trustee Services, Inc. (ID), Alaska Trustee, LLC, Northwest Title, LLC, Northwest Title Company (WA), NexTitle, a Title & Escrow Company (CA), NexTitle, LLC, Title Services of Nevada, LLC, Real Estate Title Services, LLC, Guardian Escrow Services, Inc., Solutions Escrow Company, Foreclosure Expeditors/Initiators, LLC, RIM Publications, LLC, USA-Foreclosure.com, LLC, and PacCorp Center, LLC). These affiliates, and companies to be acquired or formed in the future during the term of Employee's employment, by Employer or these Affiliates, are collectively described herein as "**Affiliates**". Employee further acknowledges and understands that this Agreement inures to the benefit of Employer and the Affiliates.

2. **Job Description.** Employee is hired as its Vice President, Southeast Region, and in connection therewith shall manage or co-manage with Joel A. Freedman all Covered Client Files in the Southeast Region (as defined below) and perform those services and activities which are generally consistent with the duties vested by Employer in such position. Employee shall also perform such other duties as may be assigned to Employee from time to time in Employer's sole discretion. The region managed by Employee (the "Southeast Region") shall initially consist of the states of Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, Tennessee and Virginia, but may be modified from time to time by Employer to include additional states or to remove states from the Southeast Region. For purposes of this Agreement, "Covered Client Files" means the Employer's client files in the Southeast Region, other than client files referred to Employer as a result of future business combinations or other future transactions with persons who are not employees of Employer, any Affiliates, Johnson & Freedman, LLC or Johnson, Freedman, Baker & Widener LLC as of the Closing Date.



PLAINTIFF'S EXHIBIT
LJ-17

RCO000019

Exhibit E

3.   **Supervision.** Employee shall report directly to and be supervised by the President of Employer, or such other person as may later be designated.

4.   **Salary; Status; Reviews.** Employee shall be paid a base salary of $11,538.46 per biweekly pay period for full-time devotion to tasks assigned by Employer, payable in accordance with Employer's standard payroll practices ("Base Salary"). Employee shall accept no other jobs, contracts, or other offers of work whether full-time, part-time, contractual, or otherwise, while employed by Employer; provided, however, that Employee may continue to serve as a manager or director of (i) American Surety Bonds Agency, LLC, a surety bond company, and may provide general management services to such company as long as Employee's service to such company does not prevent Employee from performing his duties under this Agreement and such company does not expand the scope of its services to include services beyond its current business and (ii) Johnson & Freedman, LLC or Johnson, Freedman, Baker & Widener LLC, Mercury Processing, LLC and Apollo Land and Title Company, LLC for the purpose of winding down the operations of, and dissolving, such companies. Employee, for purposes of minimum wage and overtime law, is considered exempt. Employee's performance shall first be reviewed on or around June 1, 2014, and at the end of each calendar year thereafter, to determine, in Employer's sole discretion, whether or not to adjust Employee's Base Salary.

5.   **Bonus.** Employee shall be paid an annual Incentive Bonus of Ten percent (10%) of the EBTDA (as defined below) generated by the Employer from its operations in the Southeast Region managed by the Employee alone or with Joel A. Freedman (the "Managed Operations") and, to the extent permitted by applicable law, from its Affiliates' operations in the Southeast Region to the extent such earnings resulted from services provided for the client files of the Managed Operations, such as earnings from title insurance or service of process services provided by the Affiliates in the Southeast Region (the "Affiliates Operations"); provided, however, that in any calendar year the Incentive Bonus shall not exceed one and one-half times Employee's Base Salary payments for that calendar year. EBTDA shall not include earnings resulting from the services provided by the Affiliates in the Southeast Region, other than the services provided by the Affiliates on Covered Client Files managed through the Managed Operations. Specifically, EBTDA shall not include the provision of service of process and title services to retail clients on client files that are not managed by the Employee.

For purposes of this Agreement, "EBTDA" means earnings before federal and state income taxes, depreciation and amortization of the Managed Operations and Affiliate Operations; provided that (i) interest expense shall only be included on the debt incurred by Employer and its Affiliates to support the Managed Operations and the Affiliates Operations, as reasonably determined by Employer, (ii) corporate overhead and back office services will be reasonably charged to the Managed Operations and Affiliate Operations in the Southeast Region on a basis consistent with charges to Employer's and the Affiliates' other business units and (iii) extraordinary items shall be treated as reasonably determined by Employer. In the event there is a change in the Southeast Region managed by the Employee during a calendar year, the Incentive Bonus shall be calculated, for the period prior to the change in the Southeast Region,

2

RCO000020

based upon the Southeast Region as constituted prior to the change and, for the period after the change in the Southeast Region, based upon the Southeast Region as reconstituted. All calculations of EBTDA and the Incentive Bonus shall be made in accordance with generally accepted accounting principles, as consistently applied in the United States, except as otherwise provided in this Section 5, based upon the Employer and Affiliates audited financial statements for the year. The Employer shall calculate the Employer and the Affiliates' EBTDA and the Incentive Bonus in accordance with this Section 5; provided that if there shall be any dispute over such calculations, the calculation of EBTDA and the Incentive Bonus pursuant to this section, as determined by Employer's independent certified public accountants shall be final and binding on the Employee and Employer.

The Incentive Bonus shall be paid in two installments: (a) an interim payment consisting of eighty percent (80%) of the estimated Incentive Bonus for the first six months of the calendar year (the "Interim Payment") within fifteen (15) days after the financial statements of Employer and its Affiliates for the first six months of the calendar year are circulated internally in final form to the Managers of Employer and its Affiliates, provided that such Interim Payment shall be made no later than December 31 of such calendar year; and (b) the remainder, if any, within thirty (30) days after the books and accounts of Employer and its Affiliates are closed for that year, provided that such payment shall be made no later than March 15th of the calendar year following the calendar year in which the Incentive Bonus was earned. There shall be no Interim Payment for calendar year 2013.

If the Interim Payment for any year exceeds the Incentive Bonus due to Employee, Employee shall repay such excess to Employer within thirty (30) days after the books and accounts of Employer and its Affiliates are closed for that year.

6.  **Benefits.** In addition to his Base Salary and Incentive Bonus, Employer will provide Employee with a payment equal to the premium required to be paid by Employee for family coverage under the Employer's medical insurance program, an annual car allowance of $18,000 and two million dollars ($2,000,000) of term life insurance. In the event that the premiums for such life insurance exceed three times the premiums Johnson & Freedman, LLC is currently paying for term life insurance for Employee (the "J&F Premium Amount"), then Employer shall only be required to provide the level of term life insurance that can be purchased with a premium not exceeding three times the J&F Premium Amount.

    Additionally, Employer will provide Employee with the same employee benefits that it generally provides to its other employees from time to time (collectively, the "Current ·Benefits"). Current Benefits are as listed in Employer literature, and include paid time off, medical, dental, vision benefits and 401(k) plan. All Current Benefits are as described in plans administered by others, and nothing herein shall be construed to change or modify such plans. Employer reserves the right, in its sole discretion, to modify, amend or discontinue any such Current Benefits at any time. Current Benefits will start on the earliest dates allowable under the terms of such plans.

3

RCO000021

7.  **Termination of Employment.** Employee's employment with Employer may be terminated upon written to notice Employee (a) only with Cause (as defined below) by Employer during the first two years of Employee's employment and (b) with or without cause thereafter. Employee may terminate employment with Employer upon written notice to Employer with or without Good Reason (as defined below).

If Employee's employment with Employer is terminated for any reason, any accrued but unpaid Base Salary will be paid on the next payroll period payment date. Except as expressly provided in the Contribution Agreement by and among RIM, Johnson and Freedman dated April 8, 2013 (the "RIM Contribution Agreement") or this provision, Employee's participation in all other payments and employee benefit plans or arrangements shall cease as of the termination date and otherwise be governed by the terms of the plans or policies, if any, applicable to such employee benefits plan; provided, however that Employee would have the right to receive any employee benefits that vested and were accrued prior to the termination of Employee's employment under any employee benefit plan in which Employee participated at the time of termination of employment maintained by Employer, subject to and in accordance with its terms and, in the event the Employee's employment with Employer is terminated without Cause by Employer or for Good Reason by Employee, any Incentive Bonus payable under Section 5, to the extent the measurement period for the calculation of the Incentive Bonus ended prior to the date of termination (i.e. termination is after June 30 of a year in the case of the Interim Payment for that year and after December 31 of a year in the case of the aggregate Incentive Bonus payment for that year).

Subject to the terms of the Assignment of Invention, Non-Competition, Non-Solicitation & Non-Disclosure Agreement of even date herewith (the "Non-Competition Agreement") and the RIM Contribution Agreement, if Employee's employment with Employer is terminated without Cause by Employer or for Good Reason by Employee, provided Employee executes and delivers to Employer a release, in the form attached as Exhibit A (the "Release"), without revocation as permitted by the Release, within 60 days following Employee's termination of employment (i) Employer will pay the following beginning in the first payroll period after the expiration of the revocation period set forth in the Release; thirty-six (36) months of Employee's then current Base Salary (or such lesser period as elected by Employee by written notice to Employer) (the "Severance Payment"), payable in equal installments over 36 months in accordance with the Employer's payroll practices; and (ii) twenty-five percent (25%) of Employee's unvested Profit Interest Membership Units in RIM issued pursuant to the RIM Contribution Agreement shall immediately vest following the Employee's execution and nonrevocation of the Release.

"Cause" for termination of Employee's employment shall mean the occurrence of any of the following:

(a)  Employee's death, in which event this Agreement shall automatically terminate and Employer shall have no further obligation to Employee, except to pay Employee's beneficiary any amounts otherwise earned by Employee prior to the date of his or her death;

4

(b)    The permanent disability of Employee. For this purpose, Employee shall be deemed to be permanently disabled if Employee suffers from any physical or mental disability or incapacity that renders Employee incapable of performing all of the essential duties required of him in accordance with his obligations under section 2 hereof for a period of one hundred twenty (120) consecutive days during any twelve-month period, as determined by an independent physician selected by Employer;

(c)    Employee's material breach of any term or condition of this Agreement or any other agreement with Employer or RIM and, except for breaches of the Non-Competition Agreement, the Equity Owners Agreement between Employee and Employer of even date herewith, and the Equity Owners Agreement between Employee and RIM of even date herewith, or any other agreement between Employee and Employer or RIM covering the use or disclosure of confidential or proprietary information, ownership of intellectual property, restrictions on competition or solicitation of employees, agents or customers; such breach continues for thirty (30) days after written notice to comply has been given to Employee by Employer's President and/or the Director of Human Resources;

(d)    Employee fails or refuses to comply with the reasonable and lawful policies, standards and regulations of Employer applicable to all employees of Employer which may be established from time to time and which are provided to Employee whether orally or in writing, and such failure or refusal continues for thirty (30) days after written notice to comply has been given to Employee by Employer's President and/or the Director of Human Resources;

(e)    Employee fails or refuses faithfully and diligently to perform the usual and customary duties of his employment and adhere to the provisions of this Agreement, if such failure or refusal continues for thirty (30) days after written notice thereof has been given to Employee by Employer's President and/or the Director of Human Resources;

(f)    Employee engages in any act of theft, dishonesty, fraud, gross negligence or willful misconduct in the performance of Employee's assigned duties to the extent such assigned duties are reasonable and lawful;

(g)    Employee is suspended or disbarred from the practice of law in any jurisdiction;

(h)    Any conviction resulting in Employee's imprisonment or any other conviction (including, in both cases, a plea of guilty or nolo contendere) for any crime involving theft, dishonesty, fraud or moral turpitude or which materially impacts Employee's ability to provide services to Employee or its Affiliates;

5

RCO000023

(i)     Employee, or any law firm at which he is or has been engaged as a lawyer (other than Employer, so long as not due to Employee's actions or activities) while he is or was so engaged, engages in actions or activities which result in a material adverse impact on Employer's or its Affiliates' reputation such that its or their clients or customers threaten to terminate their relationship with Employer or its Affiliates because of Employer's continued employment of Employee.

"Good Reason" for termination of Employee's employment shall mean the occurrence of any of the following events (each, an "Event") without Employee's written consent. An Event shall be deemed to occur only if Employee has provided written notice to Employer of the Good Reason within sixty (60) days after the occurrence of the Event constituting the basis for the Good Reason termination, Employer has failed to cure such Event within thirty (30) days after delivery of the notice and Employee does not terminate employment prior to the expiration of such cure period:

i.     Employer assigns duties, positions or titles to Employee inconsistent with or lower than those assigned to Employee upon commencement of his employment hereunder, except that changing the states included in the Managed Operations and Employee's title to reflect the changes in states shall not be deemed an assignment of lesser duties unless the Managed Operations is less than the entire State of Georgia;

ii.     Employee is required to relocate his principal place of employment more than fifty (50) miles from his then current principal place of employment;

iii.     Employer breaches any material provision of this Agreement;

iv.     Employer lowers Employee's then current Base Salary by a cumulative total of twenty percent (20%) or more from the Base Salary in effect on the Employee's first day of employment unless such reduction occurs in connection and on a proportionate basis with a general decrease in the base salaries of all of Employer's officers with a title of Vice President or above.

If Employee serves on the Employer's Board of Directors or RIM or its Affiliates' Boards of Managers or Boards of Directors, he agrees to immediately resign from such position at the request of such company following his termination of employment with RCO.

8.     **Tax Withholding.** Employer may withhold from any cash amounts payable to the Employee under this Agreement to satisfy all applicable Federal, State, local or other income (including excise) and employment withholding taxes. In the event the Employer fails to withhold such sums for any reason, the Employer may require the Employee promptly to remit to the Employer sufficient cash to satisfy Employee's share of all applicable income and employment withholding taxes.

6

9.  **Employment Restrictive Covenants**. In connection with Employer's hiring of Employee as a regular employee and entering into this Agreement, and in consideration of the mutual covenants contained herein, Employee has concurrently entered into a Non-Competition Agreement. This Non-Competition Agreement inures to the benefit of Employer and the Affiliates, except as otherwise provided in the Non-Competition Agreement. Employee acknowledges and agrees that Employee is voluntarily entering into the Non-Competition Agreement to induce Employer to hire Employee as a regular full-time employee, and Employee agrees that the restrictive covenants set forth in the Non-Competition Agreement are reasonably necessary and narrowly tailored to protect the legitimate business interests of Employer and the Affiliates. The Non-Competition Agreement shall survive any change, modification or amendment to, or termination of, this Agreement.

10. **Return of Company Property**. Upon termination of employment by either party for any reason whatsoever, Employee agrees to immediately return all of Employer's property, including, without limitation, all office furniture, equipment, data, manuals, lists, notes, writings, customer and product lists, passwords and other documents or tangible materials whatsoever, in any format whatsoever, and all duplicates and reproductions thereof, concerning any part of Employer's or the Affiliates' business and/or operations or concerning any part of Employee's activities as an employee of Employer (collectively, the "**Employer Property**"). To the extent that Employee fails to return any Employer Property as required herein, Employee agrees that Employer may offset Employee's compensation by the replacement value of such Employer Property as a debt owed by Employee to Employer, and Employee expressly authorizes Employer to deduct the replacement value of the Employer Property from Employee's compensation, including but not limited to Employee's Base Salary, any bonuses in addition thereto, Severance Pay and Employee's final paycheck.

11. **Notice.** Except where specifically provided otherwise, any notice required or permitted to be given hereunder shall be deemed to have been duly given (a) if by personal delivery, confirmed facsimile machine or other confirmed electronic transmission (including transmission in portable document format by electronic mail), on the date of such delivery, (b) if by certified or registered mail, on the third business day after the mailing thereof or (c) if by next-day or overnight courier or delivery, by the date of such delivery, to the parties at their respective addresses set forth herein (or at such other address as has been duly changed under this notice provision).

12. **Applicable Law; Jurisdiction and Venue.** In any action or proceeding to construe or enforce the terms of this Agreement, including any arbitration set forth in Section 14 below, the laws of the State of Washington shall govern. Sole and exclusive jurisdiction and venue for any action or proceeding to construe or enforce the terms of this Agreement shall lie in the Washington State court or federal court of the United States of America sitting in King County, Washington.

13. **Attorneys' Fees and Costs.** In any action or proceeding, including any arbitration proceeding, to construe or enforce the terms of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs, including

7

reasonable attorneys' fees and costs in arbitration, on appeal and in any bankruptcy proceeding, and the non-prevailing party shall be required to pay the fees and costs of the arbitration proceeding.

14. **Binding Arbitration.** Except as otherwise provided in this Agreement, Employer and Employee agree to resolve by arbitration all claims or controversies for which a court or administrative agency otherwise would be authorized by law to grant relief, whether or not arising out of, relating to or associated with Employee's employment with Employer or the termination thereof. Except as specifically excluded herein, this Section 14 applies to all claims that Employer may have against Employee or that Employee may have against Employer or its officers, directors, employees or agents in their capacity as such. Notwithstanding the foregoing, this Section 14 shall not apply to or cover claims for workers' compensation benefits; unemployment compensation benefits; claims by Employer for injunctive or other equitable relief; claims by Employer for unfair competition or the use or unauthorized disclosure of Confidential Information or other violations of the Non-Competition Agreement, as such relief is available under the Non-Competition Agreement; claims based upon an employee pension or other benefit plan (the terms of any such plan(s) shall govern); and any claims under the National Labor Relations Act (NLRA), as amended. Nothing in this Section 14 prevents Employee's right to file a discrimination claim with a governing administrative agency; provided, ' however, that in order to obtain personal relief on such a claim, Employee must submit it to arbitration under this Agreement.

As a prerequisite for submitting an employment dispute to arbitration, the parties agree to make good faith efforts to resolve disputes internally on an informal basis. Employee should notify Employee's supervisor or Human Resources to resolve issues internally and should generally file any dispute resolution procedures set forth in the Employment Handbook or Employer's general policies from time to time.

All covered disputes and other matters in question arising out of or related to this Agreement or its breach shall be decided by arbitration under the Employment Arbitration Rules of the American Arbitration Association (AAA) unless the parties mutually agree otherwise. The place of arbitration shall be Bellevue, Washington. The award rendered by the arbitrator shall be *final and binding*. The AAA rules, incorporated by reference into this procedure, include but are not limited to the procedures for the joint selection of an impartial arbitrator and for the hearing of evidence before the arbitrator. A complete copy of these rules may be obtained at the AAA website, www.adr.org. Notice of demand for arbitration shall be filed in writing with the other party and with AAA. Any such notice mailed to Employer shall be addressed to Human Resources as soon as possible after the aggrieved party knew or should have known of the facts giving rise to the claim, but any failure to so notify the other party shall not relieve such party from any liability that it may have to the aggrieved party other than to the extent the liable party is actually prejudiced by the failure to receive notice from the aggrieved party. In no event shall such notice be provided later than the date when the institution of a legal or equitable proceeding based upon such claim, dispute or other matter would be barred by the applicable statute of limitations.

8

RCO000026

The Arbitrator is not empowered to award damages in excess of compensatory damages, other than attorney fees and costs in accordance with this Section, and each party hereby irrevocably waives any right to recover such excess damages.

Each party's promise to resolve employment disputes by arbitration in accordance with the provisions of this Agreement, rather than through the courts, is consideration for the other party's like promise. In addition, Employee's employment by Employer is independent consideration for Employee's agreement to arbitrate claims.

The parties agree to share equally the initial AAA administrative fees. All other costs and expenses associated with the arbitration, including but not limited to each party's respective attorney's fees, shall be borne by the party incurring the expense. In any arbitration award, the arbitrator's award shall require that the non-prevailing party pay all fees and costs of the arbitration proceeding and shall include the award of reasonable attorney's fees and costs to the prevailing party as provided in Section 13. Judgment upon the award rendered by the arbitrator may be entered by any court having competent jurisdiction.

15.  **Severability.** In the event any provision of this Agreement is deemed unlawful, unenforceable or infeasible, this Agreement shall be construed in such a way as to render the surviving terms fully effective and enforceable consistent with the drafter's original intent.

16.  **Entire Agreement; Modification Only in Writing; No Construction against Drafter.** This Agreement, the Release, and the Non-Competition Agreement constitute the entire agreement between the parties concerning the subject matter contained therein and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way. No modification or amendment of this Agreement shall be enforceable or effective unless and until the modification or amendment has been reduced to writing and duly signed by both parties. Each party has had the opportunity to consult with counsel of their choosing in the drafting and negotiation of this Agreement; therefore it shall be construed against neither.

17.  **Counterparts.** This Agreement may be executed by the parties in two counterparts which together shall constitute but one original hereof. To the extent signed and delivered by means of a facsimile machine or other electronic transmission (including transmission in portable document format by electronic mail), this Agreement shall be treated in all manner and respect and for all purposes as an original and shall have the same binding legal effect as if it were the original signed version thereof delivered in person. None of the parties shall raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that such signature was transmitted or communicated through the use of a facsimile machine or other electronic transmission as a defense to the enforceability of this Agreement and each of the parties forever waives any such defense.

9

RCO000027

18.  **No Contractual or Legal Prohibitions.** Employee warrants and represents that the execution of this Agreement and the performance of work for Employer under the terms of this Agreement shall not violate the terms of any contract and shall not violate any laws to which Employee may be subject.

19.  **Internal Revenue Code Section 409A.** It is intended that this Agreement shall comply with the provisions of Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and other guidance promulgated thereunder ("Code Section 409A"), or be exempt from the application of Code Section 409A. In no event may Employee, directly or indirectly, designate the calendar year of any payment under this Agreement. The parties agree to negotiate in good faith and jointly execute an amendment to this Agreement if necessary to comply with Code Section 409A. In no event shall the Employer be responsible for any tax or penalty owed by the Employee, the Employee's spouse or beneficiary with regard to any payments or benefits provided under this Agreement. Any installment payment under this Agreement shall be treated as a separate payment for purposes of Code Section 409A. Notwithstanding anything to the contrary in this Agreement, all taxable reimbursements provided under this Agreement that are subject to Code Section 409A shall be made in accordance with the requirements of Code Section 409A. The amount of expenses eligible for reimbursement during a calendar year may not affect the expenses eligible for reimbursement in any other calendar year. Reimbursement of an eligible expense shall be made in accordance with Employer's policies and practices and as otherwise provided herein, provided, that, in no event shall reimbursement be made after the last day of the year following the year in which the expense was incurred. The right to reimbursement is not subject to liquidation or exchange for another benefit. The right to reimbursements under this Agreement shall terminate upon the termination of this Agreement. To the extent the period in which the execution and non-revocation of the Release could cross two calendar years, the Severance Payment will begin with the first payroll period beginning in the second calendar year after the Release has been executed without revocation.

20.  **Employee's Cooperation.** During the term of Employee's employment and after his termination of employment, Employee shall cooperate with Employer, RIM and their Affiliates in any internal investigation or administrative, regulatory or judicial proceeding as reasonably requested by them (including, without limitation, Employee being available to Employer, RIM and their Affiliates upon reasonable notice for interviews and factual investigations, appearing at the request of Employer, RIM or their Affiliates to give testimony without requiring service of a subpoena or other legal process, volunteering to Employer, RIM and their Affiliates all pertinent information and turning over to Employer, RIM and their Affiliates all relevant documents which are or may come into Employee's possession, all at times and on schedules that are reasonably consistent with Employee's other permitted activities and commitments).

[Signatures on the following page]

10

Employee

Name: Larry W. Johnson

Date: _____

Address:

_____

_____

Email: _____

Fax #:_____

Employer
RCO Legal, P.S.

By: _____
       Stephen D. Routh
Its: President

Date: _____

Address:

13555 SE 36th St., Ste. 300
Bellevue, WA 98006

Email: relations@rcolegal.com

Fax # 425 283-5965

11

RCO000029

Employee

Employer
RCO Legal, P.S.

By: _____

Name: Larry W. Johnson

Stephen D. Routh
Its: President

Date: _____

Date: _____

Address:

Address:

_____

13555 SE 36th St., Ste. 300
Bellevue, WA 98006

_____

Email: _____

Email: relations@rcolegal.com

Fax #: _____

Fax # 425 283-5965

11

RCO000030